UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

SA'DA JOHNSON, et al.,　　　　　)
　　　　　　　　　　　　　　　　)
　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　)　　Case No. 00-cv-1349
　　　　　　　　　　　　　　　　)
BOARD OF EDUCATION CHAMPAIGN )
COMMUNITY UNIT SCHOOL　　　　　)
DISTRICT #4,　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　Defendant.　　　　　　　　　)

## OPINION and ORDER

Before the Court is the Joint Motion for Settlement Approval filed by the parties on August 24, 2009 [Doc. 282]. The Motion is GRANTED.

### BACKGROUND

In light of the scope of this case, the following is a truncated recitation of the history of this case[1].

The class of Plaintiffs are African-American students enrolled in Champaign public schools who allege that they have been discriminated against on account of their race in various aspects of their education by Defendant, the Board of Education of Champaign Community Unit School District # 4 (hereinafter Defendant or "School District"). The Complaint was brought pursuant to 42 U.S.C. § 1983 for deprivations of 14th Amendment rights, Title VI of the Civil Rights Act of

---

[1] For a detailed rendition of the background of this case, see this Court's previous Order dated January 29, 2002 [Doc. 65]. Throughout the course of this Order, the Court assumes a familiarity with the litigation history of this case.

1964, and the equal protection clause of the Illinois Constitution. Along with the Complaint, the parties filed a joint motion to approve a Consent Decree.

The Consent Decree, which was approved on January 29th, 2002, generally has two areas: controlled choice for student assignment and educational equity. By way of summary, the Controlled Choice Plan instituted a student assignment plan that sought to achieve a 15% +/- racial composition of all schools within the district such that minorities are not over- or under-represented in each school while still allowing parents to choose the school their child attends. The Educational Equity Plan sought to eliminate unwarranted disparities between the races with respect to student discipline, alternative education, special and gifted education services, student performance (i.e. grade distribution), and the hiring and placement of staff. The manner in which these goals were to be implemented had been the subject of numerous additional agreements, briefs, and other documents. In each of these areas, Defendant and Plaintiffs outlined various goals, determined how to achieve those goals, and negotiated with each other regarding the efficacy of various policies and procedures that have been implemented throughout the years. In addition, this Court appointed Monitors to observe, analyze, and report to the Court the progress of the Consent Decree goals. The Monitors also played the role of advisors to the School District and as arbitrators of various disputes that have arisen through the years. As with other consent decrees, the underlying obligation imposed on Defendant is to attempt to fulfill the terms of the Consent Decree in good faith.

Throughout the course of the Consent Decree, the parties worked in a collaborative process to achieve the goals of the Consent Decree prior to the termination date, June, 2009 (i.e. the end of the 2008-2009 school year).  This process involved quarterly meetings (PIC – planning and implementation committee – meetings), between Plaintiffs' representatives and various school officials and teachers, the issuing of monitoring reports by the Court monitors, the drafting of additional agreements in order to specifically outline steps and goals that need to be met, and meetings between Plaintiffs' representatives and Defendant (beyond the quarterly meetings) to discuss various aspects related to the Consent Decree, among other things.  The purpose of these meetings and reports (along with responses and replies) was to identify, discuss, and resolve issues related to the Consent Decree goals.  Throughout the course of the Consent Decree, the parties have been working diligently and collaboratively to achieve the goals of the Decree; and, to the extent that they disagree, the parties have participated in mediation with the Court Monitors to resolve disputes without Court intervention.

On the eve of the termination of the Consent Decree, Plaintiffs filed two motions to either vacate the Decree or extend certain portions of the Decree [Docs. 201 and 207].  Specifically, Plaintiffs challenge Defendant's good faith efforts with respect to building two elementary strands in North Champaign, developing an appropriate alternative education program, and ensuring the lack of disparate treatment in the area of special education.  After the filing of the Motions, this Court issued an Order on July 15, 2009 [Doc. 259] indicating that the Consent

Decree had terminated on its own terms except with respect to the areas of contention and further set the Motions for a hearing to take place on August 3, 2009.

A few days prior to the hearing, the parties engaged in settlement negotiations with the assistance of Magistrate Judge John A. Gorman. As a result of those negotiations, the parties entered into a settlement agreement [Doc. 274]. The settlement agreement provides:

> 1. The entirety of the Consent Decree is terminated.
>
> 2. The Board of Education shall implement a policy regarding the opening and closing of schools and shall consider, among other things, the impact and transportation burdens on African-American students. With respect to school openings and closings, the Board of Education shall "have a publicly reported third-party analysis that complies with Board policy . . . ." In addition, the Board of Education "shall pass a resolution reaffirming its commitment" to add additional seats at Booker T. Washington and Garden Hills elementary schools.
>
> 3. The Board of Education shall create the "Education Equity Excellence Committee" (EEE). This Committee will review various equity areas contained in the Consent Decree, including special education, academic progress, and alternative education, through the lens of race/ethnicity and socio-economic status. Members of the community and Defendant's staff shall be members of the EEE and it shall be facilitated by a third party familiar with "community and District issues." The EEE is empowered to create task forces "on the equity areas as deemed necessary" and shall receive regular reports from the Superintendent.
>
> 4. The Board of Education shall create a special education policy that is implemented in a non-discriminatory manner. It shall provide reports each semester during the 2009-2010 school year to the EEE.
>
> 5. The Board of Education shall pass a resolution indicating its commitment to continue the Academic Academy for at least two years. The Board shall also "provide support and monitoring" for students transitioning from an alternative school to their home school.

In light of this agreement, the hearing on the Motions was terminated. In its stead, a Federal Rule of Civil Procedure 23(e) hearing was set to take place on September 15, 2009.

Class members were notified of the proposed settlement, the terms thereof, a summary of proceedings, and the significance of settlement through a notice in the *Champaign News-Gazette* (the local newspaper), and Defendant's website, that ran for fourteen days. Class members, and interested members of the community, were given the opportunity to make a written statement to the Court regarding their concerns or opinions about the proposed settlement. In addition, during the hearing, these persons were granted an opportunity to make a brief statement to the Court. By way of summary, a number of these comments expressed concern that there would be no oversight by the Court to ensure that the School District would comply with the terms of the settlement agreement. A hearing on the proposed settlement agreement took place on September 15, 2009 in Urbana, Illinois.

## DISCUSSION

Federal Rule of Civil Procedure 23(e) provides that the class action lawsuit may be settled only with court approval. In seeking such approval, parties must provide notice to all class members who would be bound by the settlement and must file a "statement identifying any agreement made in connection with the proposal." Fed. R. Civ. Pro. 23(e)(1), (3). In considering a proposed settlement agreement, the Court must conduct a hearing and make a finding that the settlement is "fair,

5

reasonable, and adequate." Fed. R. Civ. Pro. 23(e)(2). Adequate notice was given to class members and a hearing was conducted as noted above.

> In determining the fairness of a proposed settlement, the Court considers:
>
> 1) the strength of the plaintiff's case on the merits measured against the terms of the settlement;
>
> 2) the complexity, length, and expense of continued litigation;
>
> 3) the amount of opposition to the settlement among affected parties;
>
> 4) the presence of collusion in gaining a settlement;
>
> 5) the stage of the proceedings; and
>
> 6) the amount of discovery completed.
>
> General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1082 (7th Cir. 1997).

Generally, the first factor, the strength of Plaintiffs' case measured against the terms of the settlement, is the most important factor. In analyzing this factor the Court should "begin by quantifying the net expected values of continued litigation to the class" by "estimate[ing] the range of possible outcomes and ascrib[ing] a probability to each point on the range." Synfuel Technologies, Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7th Cir. 2006) (citations and editing marks omitted). In the case at bar, the underlying Complaint has not been litigated as in an ordinary class action. Rather, the terms of the Consent Decree have been carried out in a collaborative process. In assessing this factor, then, it seems prudent to quantify the value of continuing application of the Consent Decree, as advocated by

6

Plaintiffs in their Motions, as measured against the terms of the settlement agreement.

In evaluating the fairness, reasonableness, and adequacy of a proposed settlement, the Court must "refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights . . . ." Isby, 75 F.3d at 1196-1197 (internal editing marks and citations omitted). The proposed agreement is viewed in a light most favorable to settlement and the entirety of the proposed agreement is considered in evaluating its fairness. Id. at 1199. Moreover, "[f]ederal courts look with great favor upon the voluntary resolution of litigation through settlement. This rule has particular force regarding class action lawsuits." Air Line Stewards and Stewardesses Ass'n, Local 550 v. Tans World Airlines, Inc., 630 F.2d 1164, 1166-1167 (7th Cir. 1980) (citations omitted); Isby v. Bayh, 75 F.3d 1191, 1196 (7th Cir. 1990). In addition, "[s]ettlements are particularly valuable in complex institutional reform cases such as this one, where the actual remedial measures must be implemented by the defendants over significant periods of time and must have substantial public support to be successful." Reed v. Rhodes, 869 F.Supp. 1274, 1279 (N.D. Ohio 1994) (citing Daniel J. McMullen and Irene Hirata McMullen, *Stubborn Facts of History – The Vestiges of Past Discrimination in School Desegregation Cases*, 44 C.W.R.Law Rev. 75).

### The Strength of the Plaintiff's Case on the Merits Measured against the Terms of the Settlement

The strength of Plaintiffs' case does not begin with the Complaint but rather the Consent Decree. Plaintiffs' case further is self-whittled to the three remaining

7

areas of contention, student assignment and structural displacement, alternative education, special education. As noted in a previous Order, this Court's consideration of these areas in contention is limited to whether the parties have acted in good faith in complying with the terms of the Consent Decree. See e.g., Board of Educ. of Oklahoma City Public Schools v. Dowell, 498 U.S. 237, 249-250 (1991). The burden is on Plaintiffs to show that modification or continuation of the Consent Decree is required. Rufo v. Inmates of Suffolk County, 502 U.S. 367, 383 (1992). Thus, Plaintiffs would be required to show not merely that Defendant failed to comply with the terms of the Consent Decree, but rather that it failed to act in good faith.

With respect to student assignment and structural displacement, Plaintiffs' main dispute is with the School District's perceived lack of good faith in seeking funding for two additional elementary strands on the north side of Champaign. Plaintiffs sought alternative remedies: extending the Consent Decree to allow Defendant to cure this deficiency and for an additional 4 years for monitoring; or vacation of the Consent Decree, in this limited area, and setting the issue of structural displacement for trial. By the Plaintiffs' own Motion, then, the possible outcomes of this issue are an extension of the Consent Decree with respect to structural displacement that would both allow the School District to act in good faith in securing financing for two elementary strands and allow time for additional monitoring; or, vacation of the Consent Decree and a trial on the issue of whether

student assignment is made in a discriminatory manner.  In the event of a trial, Plaintiffs could only expect to secure an equitable remedy.

In early 2009, a sales tax referendum was initiated to raise funds for new school construction.[2]  Defendant issued a fact sheet to the public indicating that some of the revenue from the sales tax would go to building two elementary strands at Garden Hills Elementary and Booker T. Washington Elementary schools – both of which are located on the north side of Champaign.  The referendum passed in April, 2009.  In July, 2009, Defendant entered into contracts to begin construction of the two elementary strands.  While Plaintiffs do not object to the creation of the two additional elementary strands, Plaintiffs object to another portion of the referendum which would provide funding for a school in Savoy (which is not on the north side) and the related closing of, and relocation of students from, Carrie Busey school (which is on the north side).  The referendum, then, has secured the financing (albeit tardy) that Plaintiffs sought in the Consent Decree and resolved much of the dispute raised in Plaintiffs' Motion.  Thus, much of Plaintiffs' concerns in this area appear to be moot.  The settlement agreement provides for continued analysis and community involvement in future school openings and closings.  The settlement agreement also provides that Defendant consider the impact of such actions on all students, including African American students.  Finally, the agreement also includes a statement that Defendant is committed to adding the two elementary strands.  Therefore, the proposed settlement agreement represents a significant boon to Plaintiffs in light of the potential mootness of their concerns in

---

[2] Two prior unsuccessful referendums were initiated in 2006 and 2008.

the area of structural displacement. These new developments and Defendant's commitment to add additional seats in the north side weigh in favor of approval.

With respect to special education, Plaintiffs argue that Defendant failed to use best efforts in eliminating racial disparities in the referral rates to special education programs. Plaintiffs state that the referral rate is particularly skewed in areas where a subjective evaluation is made as to whether a child requires special education. Plaintiffs further argue that while Defendant may have adopted policies to resolve the disparity, it has failed to implement the policies "on the ground." As a remedy, Plaintiffs sought a three year extension of Defendant's obligations in this area.

Prior to implementation of the Consent Decree, studies indicated that African American students were over-represented in special education classes. In the final Quarterly Report for 2009 and the 5th Monitoring Report, statistical evidence reveals that the over-representation has not been resolved within fairness guidelines established in the Consent Decree and that, in fact, African American students are still over-represented in categories where a subjective evaluation is made. However, failure to meet the numerical goals of the Consent Decree, in and of itself, is not the *sine qua non* of "bad faith" in the educational setting. Many factors contribute to unequal educational participation and attainment such as "poverty, parents' education and employment, family size, parental attitudes and behavior, prenatal, neonatal, and child healthcare, peer group pressures, and ethnic

culture." See People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205, 246 F.3d 1073, 1077 (7th Cir. 2001).

Plaintiffs note that while Defendant has made recent progress in implementing policies designed to monitor and evaluate special education, such policies have no track-record and therefore cannot be properly evaluated at this time.  As indicated above, Plaintiffs will be required to show a lack of good faith in this area rather than merely pointing to statistical evidence of disparities. Defendant notes that Plaintiffs have not identified any particular student whose placement in special education is unwarranted.  The proposed settlement agreement addresses Plaintiffs' concerns by providing for the adoption of a policy that special education referrals will be made in a non-discriminatory fashion and that such referrals will be monitored.  Defendant also agrees to provide reports to the EEE for evaluation (which would allow for community involvement and a third-party monitor).  Thus, Plaintiffs are receiving what it sought in its Motion: an open-ended continuation of policies and monitoring of Defendant's special education programs.   The proposed settlement agreement, then, is also of significant value to Plaintiffs in light of the uncertainty of whether they will be able to show a lack of good faith in this area.

Finally, Plaintiffs argues that Defendant's attempts at alternative education, designed to bridge the achievement gap between the races, failed, especially with regard to the Columbia Alternative Center (which was a racially identifiable school because 80% of its students were African American).  Plaintiffs noted that the

11

Columbia Center is now closed and that a new alternative education facility is yet to be created by Defendant. In addition, Plaintiffs further noted that the Academic Academy (designed for non-traditional students) has only been open for the current school year and that its track record is yet to be assessed. Thus, Plaintiffs' sought a one year extension on this area of the Consent Decree to insure continuation of the recent changes in alternative education and to allow for an additional period of Court supervision. In the proposed settlement agreement, Defendant agreed to pass a resolution indicating its commitment to the promising Alternative Academy for at least two years. The proposed settlement agreement, then, gives Plaintiffs what they sought in their Motion: a meaningful alternative education program.

In light of the foregoing, the proposed settlement agreement addresses the remaining concerns that Plaintiffs expressed in their Motions. When weighed against the strength of Plaintiffs' case, the proposed settlement agreement represents a fair and adequate resolution. The proposed agreement grants Plaintiffs the best possible outcome: continued commitment to policies and evaluations designed to achieve educational equity and continued community involvement in Defendant's decisions. Plaintiffs may not hope to achieve such concessions if these issues were set for trial.

### The Complexity, Length, and Expense Continued Litigation

This factor favors approval of the proposed settlement agreement. There can be no doubt that this matter is complex and that resolution would involve multi-day hearings and significant expense. As of the date of this Order, this matter has

generated thousands of dollars in attorney fees, the expenditure of vast monetary and human resources by Defendant and Plaintiffs, and the use of significant judicial resources. Settlement would avoid such continuing expenditure of resources on litigation and would allow the parties to focus their resources on school programming.

### The Amount of Opposition to the Settlement among Affected Parties

There has not been significant opposition to the proposed settlement agreement by affected parties. Only a handful of individuals who are students or parents of students in the Champaign schools submitted written letters to the Court outlining their concerns. In addition to these persons, interested community members and groups also submitted statements. Each of these persons were granted an opportunity to make an oral statement to the Court during the hearing. A majority of these parties and interested parties expressed concern about accountability and how, without Court supervision, Defendant will follow through with the commitments made in the proposed settlement agreement. While this is a valid concern, the nature of this lawsuit (wherein equitable remedies are sought) does not lend itself to iron-clad resolutions and actions. Rather, there are commitments and assurances that Defendant will stick to the agreement and operate in a manner that will assure the equitable treatment of all students. Such a commitment is highly desirable in cases such as this.

The Court therefore credits Superintendent Culver's statements at the hearing:

> We agree wholeheartedly with the terms of the Settlement Agreement, which reflect continued collaboration with all segments of our community[;] also, and very importantly, it reflects best practices as well as transparency. The plaintiffs and the monitoring team have worked extremely hard throughout this process to assist in crafting an agreement that reflects our continued efforts on behalf of African-American students in this District. Our staff, our board, and our community have shown their commitment to the goals of the Consent Decree. And we will not be turning the clock back and losing the lessons that we have learned in the past seven years. We will definitely continue the policies, practices, systems and programs and the processes that ha[ve] led us to where we are today.

The Court also credits the statement of Board President Dave Tomlinsen as reflective of institutional support for the proposed settlement.

> Though we are extremely proud of what the District accomplished, we will not rest. We will chart the District's future, of course, using the policies, practices, procedures and systems that have allowed us to reach a successful conclusion to the Consent Decree. We will continue our commitment to educational equity and fairness in the District and we will continue to hold the superintendent and his staff accountable for implementing the Board's policies. We believe we have met the goals of the Consent Decree.
>
> The Settlement Agreement provides assurances that we will continue our commitment to the goals of the Consent Decree. As evidence of this commitment, the District has moved forward with the policies that were part of the Settlement Agreement. These included the Education Equity Excellence Committee Policy, the Special Education Policy, and the School Openings and Closing Policies. These policies reconfirmed our ongoing commitment to equity.
>
> \* \* \* \*
>
> The Consent Decree opened a much needed dialogue on race relations and educational equity in Champaign and specifically has addressed issues of race and equity in Champaign schools. The resolution of this litigation through the Settlement Agreement allows every community leader, every member of the community, and all District staff, parents and students to come together to work cooperatively and proactively to continue to improve race relations and

educational equity throughout the community. Not because this Court requires it, but because it is the right thing to do.

In a representative democracy, elected officials are held responsible for fidelity to their public trust at the ballot box, and elected school boards and the educational policies they espouse are subject to the same public accountability. The Plaintiffs' class, like all other interested citizenery, must invest time and involvement in monitoring and helping the School District stay the course in advancing the goals of the Consent Decree. Dependency on the Court to do that is obviously convenient but not necessarily as effective and should be the last resort of an involved citizen. The Court considers it axiomatic that "school desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy." See Armstrong v. Bd. of Sch. Dirs. of Milwaukee, 616 F.2d 305 (7th Cir. 1980).

The parties and the Champaign community have come a long way in achieving educational equity for African American students since the beginnings of the Consent Decree in 2002. The Court will not (as a few would like) presume the duplicity of the School District in entering into this settlement. The skepticism expressed by some at the public hearing is based on long memories of past transgressions rather than the past seven years of transformative progress toward a race – neutral educational environment that is most likely to continue after the Consent Decree ends. With this mind-set, the parties and the community can put the distant past behind and look forward to the continuation of a new beginning

15

where the educational needs of children of color are equally served by the School District.

### The Presence of Collusion in Gaining a Settlement

This case was certified prior to the proposed settlement agreement. Plaintiffs' counsels' attorney fees are yet to be determined. The parties engaged in arms-length negotiations on July 28 and 29, 2009 with the assistance of Magistrate Judge Gorman and Court Monitor Robert Peterkin in order to reach an agreement. As such, this Court finds that the proposed settlement agreement was the result of good faith negotiations and not the result of collusion.

### The Stage of the Proceedings and the Amount of Discovery Completed

These proceedings are now at their final stage due to the expiration of the Consent Decree. The parties have been working with each other and sharing information for the past seven years. Each of the attorneys in this matter has a depth of knowledge of the issues, solutions, and results that have arisen over this time period. While discovery was truncated with respect to the issues raised by Plaintiffs in their Motions, the parties conducted numerous depositions, exchanged written discovery, and completed discovery with respect to those issues. As such, the proposed settlement agreement was made with significant and a reasonable amount of knowledge on both sides.

## CONCLUSION

This Court finds that the proposed settlement agreement is fair, adequate, and reasonable and hereby APPROVES the settlement agreement. The settlement agreement represents a significant bargain for Plaintiffs that outweighs the potential merit of Plaintiffs' case and is not the product of collusion between counsel. The Court is convinced that the agreement represents the best method of continuing the progress made in the Champaign schools that was started by the Consent Decree. This Court further is convinced that the agreement places the future of Champaign school children in the hands of the persons best equipped to educate: the administrators, teachers, and staff of the Champaign schools, the community they serve, and the parents that are part of that community.

The Consent Decree is hereby TERMINATED in its entirety.


Entered this <u>4th</u> day of November, 2009

                                                                 s/ Joe B. McDade
                                                          JOE BILLY MCDADE
                                            United States District Judge