# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| SA'DA JOHNSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 00-cv-1349 |
| | ) | |
| BOARD OF EDUCATION CHAMPAIGN | ) | |
| COMMUNITY UNIT SCHOOL | ) | |
| DISTRICT #4, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION and ORDER

By previous Order (Doc. 330), this Court determined that Plaintiffs are entitled to reasonable attorney fees in connection with their monitoring of compliance with the Consent Decree and in their post-decree efforts to modify or extend the decree. This Court nonetheless directed Plaintiffs, who carry the burden of showing their entitlement to attorney fees, to provide the Court with timesheets for hours expended that had not already been paid by Defendant and argument justifying the hourly rate that they requested. The Court was particularly concerned with imposing hourly rates charged in the Chicago market upon Defendant for work related to litigation in this District. The Court also was concerned with the lack of specificity with respect to what fees had been paid, what fees remained outstanding, and the reasonableness of certain fees requested. The Court instructed Plaintiffs, in their response, to exercise billing judgment in removing fee requests that are unreasonable. By way of guidance, the Court noted

that certain categories of fees were patently unreasonable: fees related to multiple attorneys attending meeting or conferences in which they are redundant or unnecessary, fees related to activities that could be performed by paralegals or support staff, fees that are excessive in light of the activity performed, and, fees that are unrelated to the consent decree.

The parties have submitted their arguments and supporting documents. Plaintiffs now seek a total of $1,301,500.87 in attorney fees. This amount is $305,395.33 less than the original amount sought by Plaintiffs, $1,606,896.20  The two issues that remain to be decided, then, are the reasonable hourly rate and the reasonable number of hours expended.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

## I.  Reasonable Hourly Rate

In the previous Order, this Court expressed skepticism in imposing Chicago hourly rates to litigation in this district.  In *Tomazzoli v. Sheedy*, 804 F.2d 93 (7th Cir. 1986), the Seventh Circuit noted that "Plaintiffs' civil rights attorneys who practice in downstate Illinois can expect smaller fees than their counterparts in Chicago; this differentiation is in line with Congress' intent that Section 1988 fee awards not produce windfalls to attorneys." *Id.* at 99.  The Court is not convinced, however, that *Tomazzoli* is applicable to this matter because, in that case, the plaintiff's attorney did not practice in Chicago but rather in this district; in this case, Plaintiffs' attorneys, with the exception of Ms. Hervey, work in Chicago and presumably regularly charge Chicago rates.

Plaintiffs bear the burden of proving a reasonable hourly rate. Such a rate is the "rate that lawyers of similar ability and experience in the community normally charge their paying clients for the kind of work in question." *Stark v. PPM America, Inc.*, 354 F.3d 666, 674 (7th Cir. 2004. In *Mathur v. Board of Trustees of Southern Illinois University*, 317 F.3d 738, 743 (7th Cir. 2003), the Court stated that "our preference is to compensate attorneys for the amount that they would have earned from paying clients, i.e. the standard hourly rate." *Id.* at 743. In establishing such a rate, the Court may look to the "actual billing rate" charged by the attorney, or if not provided, the rates of similarly experienced attorneys for similar work, and may impose the higher rates of out-of-district attorneys unless there is a finding that local attorneys could have provided the same quality of representation. *Id.* at 743-744. Along a similar vein, this Court may also find that a reasonable rate is one charged in the actual local community or the rate charged by a "community of practitioners." *Id.; Jeffboat, LLC v. Director, Office of Workers' Compensation Programs*, 553 F.3d 487, 490 (7th Cir. 2009). Once Plaintiffs have met their burden, the burden shifts to Defendant to show that a lower rate is appropriate. *Stark*, 354 F.3d at 675.

The hourly rates that Plaintiffs seek are listed in Table 1 below and reflect yearly increases:

TABLE 1

| | Bar Admission Date | Hourly Rate Requested | | | |
|---|---|---|---|---|---|
| | | 2006 | 2007 | 2008 | 2009 |
| Ronald Futterman | 1967 | $575 | $595 | $620 | $635 |
| Robert C. Howard | 1967 | $575 | $595 | $620 | $635 |
| Stewart M. Weltman | 1978 | | | | $650 |
| Kathleen Mangold-Spoto | 1986 | $445 | $465 | $490 | $510 |
| Carol R. Ashley | 1994 | $375 | $395 | $415 | $435 |
| Alonzo Rivas | 1999 | | | $350 | $375 |
| William W. Thomas | 2001 | $260 | $290 | $305 | $325 |
| Rafael A. Vargas | 2007 | | $225 | $225 | $245 |
| Venita Hervey | 1995 | | | $210 | $210 |
| Paralegals/Law Clerks | | $160 | $175 | $185 | $195 |

Plaintiffs have provided the affidavit of Ms. Hervey who attests that her current hourly rate is $210.00, which is the market rate in Rockford, Illinois. (Doc. 315-3, p. 3). None of the Chicago attorney, however, have provided similar affidavits attesting that the rates charged in this case are what they would have charged paying clients. That is, Plaintiffs' attorneys (except Ms. Hervey) have not themselves attested to their normal hourly rate. The closest Plaintiffs' Chicago attorneys have come to attesting to their actual hourly rate is a declaration by Ms. Ashley that "in setting their rates, Plaintiffs' counsel consider the rates of other

Chicago Firms that maintain a significant practice of representing plaintiffs in class actions." (Doc. 331-4, p. 55, ¶ 14). The timesheets, however, do list hourly rates for each of the attorneys and paralegals who performed work in this case. The Court assumes that these rates are what Plaintiffs' Chicago attorneys would have charged paying clients for each of the years that fees are sought. Plaintiffs also have noted that Defendant has consistently, or at least prior to the current dispute, paid the hourly rates sought by their attorneys (with, perhaps, the exception of Mr. Weltman who entered this case in 2009 when Defendant stopped paying Plaintiffs' attorneys' bills). Ms. Ashley further avers that the two clients who initiated this lawsuit, Mr. Johnson and Mr. Stevens, indicated to her that they were unable to find experienced attorneys for this case in the Central District. (Doc. 331-4, p. 76, ¶ 30).

In addition, Plaintiffs provide the declarations of Robert D. Allison, Thomas Meites, and Kenneth N. Flaxman (Exs. D, E, F, Doc. 331-5) in support of the hourly rates requested.

Mr. Allison states that he is the principal of the firm of Robert D. Allison & Associates who specializes in federal civil rights class actions suits and who was admitted to the bar in 1974. Mr. Allison lists a number of class action lawsuits which he prosecuted primarily in the Northern District of Illinois. His hourly rate in 2009 is $550, in 2007 it was $500 and in 2006 it was $475 (his declaration does not indicate a rate for 2008). Mr. Allison provides the opinion that the rates listed above are "reasonable and consistent with the hourly rates charged by lawyers and paralegals in the Chicago Market with similar experience" and bases this conclusion

on his review of "affidavits, surveys, fee agreements, court opinion in the Chicago area and other documents reflecting such rates." Mr. Allison further has provided a chart which lists a sampling of the rates various attorneys in the Chicago area have sought and/or been awarded in complex and/or class action lawsuits based on affidavits, declarations, and court rulings. Of particular interest in this chart, is one entry stating that Ronald L. Futterman, provided a declaration in 2006 in an unspecified case seeking an hourly rate of $160 for paralegal work.

Mr. Meites avers that he is the principal of Meites, Mulder, Mollica, and Glink who was admitted to the bar in 1970 and who specializes in federal class action lawsuit. He states that his current hourly rate is $775 and that other partners in his office have rates of $665 and $605. M. Meites provides a similar opinion that the rates charged by the attorneys in this case are reasonable.

Mr. Flaxman declares that he is the principal of the firm Kenneth N. Flaxman P.C., that he was admitted to the bar in 1972 and that he has participated in a variety of class action lawsuits. His current (2009) hourly rate is $625, in 2008 it was $600, in 2007 it was $600, and in 2006 it was $575. Mr. Flaxman similar declares that the rates charged by Plaintiffs' attorneys are reasonable.

In combination, these declarations provide a sampling of fees that a general community of civil rights, class action practitioners in the Chicago area charge. The fees sought in the various cases listed by these declarants range from a request for a $222 hourly rate in 2007 for an attorney admitted in 2005 to a request for a $500

hourly rate in 2002 for an attorney admitted in 1969 (in addition to the rates charged by the declarants above).

In response, Defendant argues that the hourly rates should be reduced to rates that are typically awarded in this District in various civil rights cases. Defendants specifically state that the rates for attorneys should be reduced to $275.00 for the most experienced of Plaintiffs' attorneys (regardless of admission date), $210.00 for the least experienced of Plaintiffs' attorneys (again regardless of admission date), and $100.00 for paralegals. The Court does not find Defendant's arguments convincing.

First, it is un-rebutted that Plaintiffs initially were unable to find an attorney in this District willing to take on this case, hence the necessity of retaining attorneys from outside of this District. Defendants themselves have pointed out no attorney in this District who would have the requisite skill or experience to represent Plaintiffs in this matter. The Court also notes that this case is not a run-of-the-mill civil rights action of the same stripe as the cases listed by Defendant in its brief. To be sure, this matter is also not a typical class action suit in which there is a fund out of which plaintiffs' attorneys would recover a fee. However, none of the cases cited by Defendant involved the same type of complexity and years of monitoring that were involved in this case. In light of the nature of this case, the complexity of the issues, the lack of evidence of competent local attorneys, the necessary expertise that Plaintiffs' attorneys have with respect to education equity issues, the fact that Defendant paid Plaintiffs' attorneys their requested hourly

rates in the past,[1] and that the rates are not out-of-line with the declarations provided by Plaintiffs, the Court finds that the hourly rates sought by Plaintiffs' attorneys are reasonable.

The only caveats to this finding are the rates charged by Mr. Weltman and Ms. Mangold-Spoto. According to Plaintiffs, Mr. Weltman is Of Counsel with Futterman, Howard, Watkins, Wylie & Ashley, Charted (hereinafter, "the firm") and has been a practicing attorney for 30 years specializing in "complex litigation" but not necessarily litigation related to civil rights or education equity issues. Ms. Mangold-Spoto is also listed as Of Counsel, however, the firm resume provided by Plaintiffs offers no information as to her areas of expertise or background. Ms. Ashley, in her declaration avers that Ms. Mangold-Spoto was brought into the case and specialized on the issues of NorthSide Seats and student assignment. (Doc. 331-4, p. 69, ¶ 10). Ms. Ashley also avers that Mr. Weltman was involved in the case in order to prepare for the August 3, 2009 hearing. Other than the fact that these two attorneys have more general experience than Ms. Ashley, there is no indication in the record why they command a greater hourly rate than the lead attorney in this matter. There is no suggestion in the record that they have some sort of specialized skill or knowledge in the area of civil rights or education that would render their greater hourly rate appropriate. *See People Who Care v. Rockford Bd. of Educ., School dist. No. 205*, 90 F.3d 1307 (7th Cir. 1996) (stating

---

[1] Defendant argues that the fact that it paid Plaintiffs' attorneys their requested hourly rate is meaningless because they essentially had no choice in the matter. The Court, however, finds it hard to believe that Defendant would choose to pay an hourly rate that it believed would be exorbitant or beyond reasonable bounds.

that "[t]he experience (or inexperience) of an attorney is a permissible reason to depart from the presumptive rate").  Moreover, there is no explanation by Plaintiffs as to how their status as "Of counsel" would translate to an hourly rate that is greater than partners and principals in the firm.  The Court is loathe to allow such hourly rates given the lack of convincing evidence regarding these attorneys' level of expertise, the necessity of their involvement in this matter, and evidence justifying rates that are higher than the lead attorney in this case (who has the requisite specialized skill and expertise).  For these reasons, their hourly rates are reduced to those charged by Ms. Ashley.[2]

## II.  Reasonable Hours Expended

As indicated above, this Court already has pointed out a number of entries that have appeared unreasonable.  In response, Ms. Ashley indicates in her declarations that she has scoured the timesheets and used her judgment in eliminating entries that appear questionable (thus resulting in the lowered amount of the fees request indicated above).   In particular, Plaintiffs eliminated a 5.6 hour entry for Mr. Rivas, billed for the attendance of only two attorneys at various meetings, reduced by 14.5 hours the time spent by Mr. Thomas in reviewing the January 2008 quarterly report, and deleted entries related to the reading of local newspapers.  (Doc. 331-4, pp. 56 – 58).  Ms. Ashley points out that she has attempted to ascertain other specific objections that Defendant has with respect to

---

[2] The Court notes that in the firms resume, it is highlighted that Mr. Weltman "is a frequent author and lecturer on the subject of lean litigation practices and lowering litigation costs . . ."  (Doc. 315-1, p. 9).

particular entries but that she has been unsuccessful because Defendant has only offered broad objections without specific reference to line-items.

In response to the revised fee petition, Defendants seek a percentage reduction and have highlighted certain entries that appear unreasonable from January, 2009 to September, 2009.

Defendant does not appear to object to the specific fee request, by the firm totaling $191,097.09, for the time period of September 2006 to December, 2008 (i.e. work related to monitoring compliance). However, Defendant points out the reductions made by Plaintiffs, in the amount of $106,781.06 are almost equal to the amount that it did not approve, $102,247.00. (Doc. 334-1, p. 2). Defendant has not provided any particular objection to any of the fee requests for this time period (except with respect to Ms. Hervey's fee requests). For the firm, then, the amount that Plaintiffs are seeking for this specific time period is $191,097.09. (Doc. 331-2, p. 152)[3]. This amount takes into account payments made by Defendant during this time period. This amount also includes fees for Ms. Mangold-Spoto at the hourly rates that this Court finds unreasonable. From the Court's perusal of the timesheets (Docs. 331-1 and 331-2), the time expended by Ms. Mangold-Spoto resulted in a total of $31,230.50 in fees at the rate encouraged by Plaintiffs. Based on the Court's reduction of that hourly rate, as explained above, Plaintiffs may only

---

[3] Because of the manner in which CM/ECF has printed document numbers and page numbers on the timesheets filed by Plaintiffs, it is difficult to decipher the actual document number and page number. The Court will endeavor to be accurate. To that end, it should be noted that the original time sheets were docketed as attachments to Documents 279 and 328 and were resubmitted by Plaintiffs (with handwritten revisions) as Doc. 311. The Court will refer to the page numbers listed in Doc. 311 for ease of reference.

recover $26,474.00 for her time. (See Table 2 below). Taking into account the difference of $4,756.50, the amount owed Plaintiffs for this time period (September, 2006 to December, 2008) for work completed by the firm is **$186,340.50**.

**TABLE 2**

| Date | Hours Expended | Requested rate | Original Amount Requested | Court's Revised Rate | Revised Amount | Difference |
|------|------|------|------|------|------|------|
| Nov. 2006 | 7.6 | $445 | $3,382.00 | $375 | $2,850.00 | |
| Feb. 2007 | 1.20 | $465 | $558.00 | $395 | $474.00 | |
| March 2007 | 1.0 | $465 | $465.00 | $395 | $395.00 | |
| April 2007 | 0.20 | $465 | $93.00 | $395 | $79.00 | |
| May 2007 | 0.6 | $465 | $279.00 | $395 | $237.00 | |
| June 2007 | 6.40 | $465 | $2,976.00 | $395 | $2,528.00 | |
| July 2007 | 10.4 | $465 | $4,836.00 | $395 | $4,108.00 | |
| Aug. 2007 | 18.7 | $465 | $8,695.50 | $395 | $7,386.50 | |
| Sept. 2007 | 0.4 | $465 | $186.00 | $395 | $158.00 | |
| April 2008 | 0.5 | $490 | $254.00 | $415 | $207.50 | |
| May 2008 | 14.00 | $490 | $6,860.00 | $415 | $5,810.00 | |
| June 2008 | 2.90 | $490 | $1,421.00 | $415 | $1,203.50 | |
| Aug. 2008 | 2.2 | $490 | $1,078.00 | $415 | $913.00 | |
| Sept. 2008 | 0.3 | $490 | $147.00 | $415 | $124.50 | |
| TOTAL | | | $31,230.50 | | $26,474.00 | $4,756.50 |

During some of this same time period, Ms. Hervey billed $80,717.35 (January to December, 2008) in fees to which Defendant objects on a theory of laches. Defendant argues that because Ms. Hervey failed to submit her fee request within 6 months of accrual and Defendant has been prejudiced by such a delay, she is now barred from seeking such fees. Defendant has not objected to any particular line item. The Court finds Defendant's argument unconvincing.

"Laches is an equitable doctrine that precludes a litigant from asserting a claim when the litigant's unreasonable delay in raising the claim has prejudiced the opposing party." *People v. Hill*, 934 N.E.2d 43, 48 (Ill. App. Ct. 2010). For the doctrine to apply, Defendant must show both an unreasonable delay and material prejudice as a result of that delay. *Hayes v. State Teacher Certification Bd.*, 835 N.E.2d 146, 159 (Ill. App. Ct. 2005). The doctrine is generally used to bar causes of actions and Defendant has presented no case authority that any Illinois Court has applied the doctrine to a motion for attorney fees. Defendant does not explain why this Court should expect Plaintiffs to provide their fee petition within 6 months of accrual – the only explanation is if Defendant is arguing that it would owe such fees based on the oral contract (which was discussed in the previous Order). The Court, however, is not enforcing the oral contract between the parties but is rather imposing fees pursuant to § 1988. Generally such motions and fee petitions are timely filed at the end of a lawsuit. Therefore, the Court finds that the doctrine of laches is inapplicable to this case. Ms. Hervey is thus awarded **$80,717.35** in fees and costs for work completed in 2008.

Defendant does, however, object to various entries for 2009 and in particular those fees related to extension of the Consent Decree.[4] As stated in this Court's previous Order, Plaintiffs are entitled to fees as prevailing parties in relation to their activities in attempting to extend three areas of the Consent Decree, the development of two elementary strands (Northside seats), the development of appropriate alternative education, and issues regarding special education, even though these extension related activities ultimately resulted in a settlement agreement. In any other case, such a settlement agreement would not render Plaintiffs "prevailing parties" pursuant to 42 U.S.C. § 1988 because a settlement agreement does not carry with it a judicially sanctioned change in the legal relationship between the parties. *See Buckhannon Bd. and Car Home, Inc. v. West Virginia Dept. of Health and Human Services*, 532 U.S. 598, 604-605 (2001). However, this case is unique. While a majority of the Consent Decree expired by May, 2009, this Court extended the Decree in the three areas outlined above in order to consider Plaintiffs' extension (or vacation) motions. Thus, activities related to those extension Motions were in furtherance of the Plaintiffs' role as monitors of Consent Decree compliance. In this sense, Plaintiffs are entitled to reasonable attorney fees for extension related activities up until the date of settlement, July 29, 2009, and in furtherance of Rule 23 requirements.

---

[4] Plaintiffs' motion to modify, or vacate the Consent Decree was filed on February 19, 2009 (Doc. 201). The motion for a limited extension of the Consent Decree was filed on April 27, 2009 (Doc. 207).

This conclusion does not mean, however, that the parties' settlement agreement has no bearing on the overall success of Plaintiffs' case. As indicated previously, "[a] party is considered prevailing for § 1988 purposes when the court enters final judgment in its favor on some portion of the merits of its claims." *Zessar v. Keith*, 536 F.3d 788, 795 (7th Cir. 2008). Thus, the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship . . . *the degree of plaintiff's overall success goes to the reasonableness of the award* . . . not to the availability of a fee award *vel non*." *Texas State Teachers Ass'n v. Garland Independent School District*, 489 U.S. 782, 792-93 (1989) (emphasis added). If success is measured by whether the Plaintiffs succeeded in their motion to extend, modify, or vacate the Consent Decree, then success is limited because they only were able to extend the Consent Decree for a limited period of time in three limited areas. This Court did not modify or vacate the Consent Decree in any meaningful manner nor did Plaintiffs achieve any judicial sanctioned extension of the Consent Decree in order to achieve the goals outlined in the settlement agreement. The result of the extension activities was a settlement agreement that, while approved by the Court pursuant to Rule 23, is merely a contractual agreement and not an extension of the judicial sanctioned Consent Decree: that is, Plaintiffs' motions were not granted. Thus, while Plaintiffs are entitled to attorney fees related to extension activities, such fees must be tempered by the limited success that Plaintiffs achieved.

With these considerations in mind, the Court moves to the fee requests, and objections, for 2009. Defendant argues that Plaintiffs' fee petition is exorbitant for a number of reasons.

**A. "excessive inter-office communication."**

Defendant notes that Plaintiffs seek compensation for 549 hours of inter-office communication in 2009 for a total of $223,171.00 in fees. It is unsurprising to the Court that a team of six attorneys (plus paralegals) would need to speak with each other regarding the Consent Decree, efforts to extend it, and in preparation for trial. The Court also notes that the timesheets specifically refer to this case. The Court would assume, then, that these conferences related to this case and not other matters unrelated to either monitoring or extension work.

However, the Court would reasonably expect Plaintiffs' counsel to accomplish this process by periodic conferences by telephone or otherwise to lessen litigation costs. Convening conferences after every event in this case would be wasteful when it would be sufficient to hold weekly or even bi-monthly conferences. For example, in February, 2009, CRA held almost daily conferences with WT. There is no showing that such daily conferences are necessary. It would have been more cost-efficient to hold a weekly meeting to discuss the various issues rather than an individual meeting to cover only one topic. Moreover, it is also inefficient to hold separate meetings with different attorneys covering the same topic. For example, on February 14, 2009, WT appeared to have a separate conference with RV and

VEH covering the same topic, "Drafting QR Response." Such a conference should have been held jointly.

### B. "redundant or unnecessary hours"

Defendant objects, essentially, to multiple attorneys attending various meeting and hearings. In particular, Defendant objects to 3 attorneys attending a community meeting in Champaign on May 16, 2009, Ms. Mangold-Spoto's attendance of a Court hearing on April 27, 2009, and Ms. Hervey's presence at various quarterly meetings in February 2008, November, 2008, and April 2009. The Court does not find it unusual for two or three attorneys to attend one meeting or court hearing where they are active participants, especially in light of Ms. Ashley's un-rebutted declaration that each attorney specialized in a particular aspect of the Consent Decree. It should be noted that this case and the Consent Decree generated reams, upon reams, of reports, statistical analysis, motions, responses, plans, and the like. To expect one or even three attorneys to be experts on each and every area of the Consent Decree would be unreasonable. However, in the absence of any showing that they participated in the meetings related to their specialized involvement in the Consent Decree, the Court finds merit to Defendant's objections.

### C. "vague entries"

Defendant next argues that various entries are vague. By way of example, Defendant points to the month of July 2009 and the entries for Ms. Ashley and Mr. Thomas. These vague entries include "trial and mot prep, team mtg" and "review documents/research/drafting for sj response, research/drafting/editing limine

motions (X2) and daubert motion and pretrial order, conf and emails with team re same (several). These entries are vague in the sense that the particular subject matter of the motions being prepared or researched are not specified, especially with respect to Ms. Ashley's time. The Court notes that other attorneys listed the type of motions they were preparing (i.e. motions in limine, Daubert motions, and summary judgment motions) whereas Ms. Ashley's entries do not. As such those entries are vague and the Court is unable to ascertain their reasonableness. The Court does not find Mr. Thomas' entries during the same time period to be vague. To require Plaintiffs to outline the exact nature of the research or the substance of the motions would be excessive detail.

A perusal of the timesheets reveals similar entries where the type of motion researched or prepared is not specified or the entry is vague. By way of example, on January 9, 2009, RV reported "follow-up"; on January 21, 2009, ACT reported "background research/case review"; on February 11, 2009, SME reported "rsrch re docs for motion"; on February 17, 2009, KMS reported "revise brief and draft motion"; on March 4, 2009 SME, reported "rsrch per VEH" and "RSRCH per CRA re motions"; on April 16, 2009, AR reported "write memo re report"; on May 6, 2009, SME reported "research, filing prep and filing"; and on June 10, 2009, SME reported "doc review" and "rsrsch re hearing." These entries are likewise vague and offer no basis for a finding of reasonableness.

### D. "block billing"

While "'block billing' does not provide the best possible description of attorneys' fees, it is not a prohibited practice." *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 569 (7th Cir. 2006). Mr. Thomas employed block billing in describing work on major motions like the motion for summary judgment and Daubert motion. It is unnecessary for Mr. Thomas to specify the exact number of minutes spent on researching a particular motion and drafting the motion. It is not unusual for an attorney to research and draft a motion at the same time. However, the Court does find the block billing of multiple motions to be troubling. From the chart provided by Defendant, Mr. Thomas spent 15 days of at least 8 hours working on various motions including a response to the motion for summary judgment on special education issues (which was filed by Defendant on June 30, 2009). If even half that amount of time was spent on a response, it would be excessive. The Court also is confused as to why Ms. Hervey, the designated expert on special education, did not draft/research a response to the motion for summary judgment on that topic. Because of Ms. Hervey's reduced rate, the task could have been accomplished at a lower cost.

With respect to Mr. Vargas' time, there are certain entries, outlined in Defendant's Appendix F, that similarly appear excessive. For example, an entry on June 4, 2009 for "compile doc production index" appears to be work that could have been done by a paralegal. The same goes for various entries related to document

preparation for depositions.  In any event, the Court would reduce these amounts but will not exclude them entirely.

### E. "inaccurate accounting"

It appears that Plaintiffs have corrected the accounting errors noted by Defendant.

### F. "fees for non-monitoring legal work"

Defendant asserts that Plaintiffs continue to seek fees for work unrelated to the Consent Decree, in the amount of $5,930.50, and for fees related to redistricting and student assignment post-Consent Decree, in the amount of $3,328,50.  Fees for work unrelated to the Consent Decree are disallowed.  In light of the reductions noted below, the Court will not simply subtract the amounts identified by Defendant but will assume that any inadvertent inclusion of such amounts will be resolved by the reductions identified below.

### G.  Reasonableness of fees in light of success

In awarding fees in this case, the Court is mindful of the function of fee-shifting statutes:

> Fee-shifting provisions signal Congress' intent that violations of particular laws be punished, and not just large violations that would already be checked through the incentives of the American Rule.  The function of an award of attorney's fees is to encourage the bringing of meritorious claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel.  Or, more simply stated, fee-shifting helps to discourage petty tyranny. *Anderson v. AB Painting and Sandblasting, Inc.*, 578 F.3d 542, 545 (7th Cir. 2009) (citations, quotations, and editing marks omitted).

The Court is also mindful that it may not just "'eyeball and decrease the fee by an arbitrary percentage because of a visceral reaction that the request is excessive." *Schlacher v. Law Offices of Phillip J. Rotche & Associates, P.C.*, 574 F.3d 852, 857 (7th Cir. 2009). The amount may, however be reduced in light of various factors including "complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Id.* at 856-857; *See also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (finding that "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained."). As such, "the *degree* of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee. . . ." *Tex. State Teachers Ass'n*, 489 U.S. at 790.

By filing this suit and monitoring progress under the Consent Decree, Plaintiffs certainly have advanced the public interest in providing educational opportunities without the stain of discrimination. This matter also is highly complex both in terms of the legal issues involved and the amount of data, reports, plans, and studies that required review and monitoring. For this work, Plaintiffs' attorneys have been adequately compensated by payment of their reasonable attorney fees through December, 2008. However, work related to Plaintiffs' extension motions must be separable in light of the fact that those motions did not result in either an extension of the Consent Decree or vacation of the Consent Decree in preference of trial on the merits. While the motions themselves are properly part of Plaintiffs' monitoring activities (after all, what would have been the

point of allowing Plaintiffs to monitor progress under the Consent Decree if they had no means of bringing deficiencies to the Court's attention), the resultant settlement agreement between the parties removed the areas of contention from the Court's monitoring of the Champaign schools pursuant to the Consent Decree. Therefore, this Court finds that Plaintiffs achieved only limited success, the extension of the Decree for a few weeks in only three areas, with respect to their efforts to extend the Decree.

With this conclusion in mind, the Court finds that Plaintiffs are entitled to fees related to monitoring work (unrelated to extension work) for 2009. In light of the rulings above, this amount will be reduced by 15% to account for vague or otherwise unreasonable entries. This amount also will be reduced by 10% (for a total of 25%) to account for the inability of the Court to definitely identify which entries are wholly related to extension work and which are merely related to monitoring work. The Plaintiffs are also entitled to a portion of their fees related to extension activities. However, because of the limited nature of success (and in light of the rulings above), these fees are reduced by 66%. The Court believes that these percentage reductions will both reflect the reasonableness of specific entries and the limited success that Plaintiffs achieved in attempting to extend or vacate the Consent Decree.

It is not wholly clear from the timesheet what amount of specific time was spent on extension activities as separable from other monitoring activities. The

following, however can be gleaned from the timesheets submitted by the firm.  Ms. Hervey's timesheets will be discussed in separately.

### 1. January, 2009

In this month, KMS worked exclusively on extension matters.  She billed for 29.40 hours at a rate of $490.00 for a total of $14,406.00.  RLF and CRA conferred for .3 hours "re next steps re CD" – which the Court assumes is also extension work – for a total of $190.50 for RLF (at a rate of $635.00) and a total of $130.5 for CRA.  On January 28, 2009, WT, AR, RV, and SME, and CRA  reviewed the draft motion prepared by KMS and conferred (the Court assigns .2 hours to this conference as noted by SME with respect to CRA's time).  The total amount listed is $1,037.50.

Of the January, 2009 total provided by Plaintiff of $37,101.00, $15,564.50 related to extension work.  Of this later amount, $14,406.00 is credited to KMS.  In light of the reduced rate identified above, KMS is entitled to $12,789.00 (29.4 hours times rate of $435) for this work.  Thus, the total amount for extension work is $13,947.50, monitoring work accounted for $21,536.50.  These amounts reduced by the percentages above, 66% and 25%, respectively, generate a fee for January, 2009 of $4,602.68 and $16,152.38, respectively.  The total amount for January, 2009 is **$20,755.06**.

### 2. February, 2009

During this month, KMS appeared to work exclusively on extension related matters – 21.8 hours at a rate of $490.00 for a total of $10,682.00.  Conferences, research, and reviews of drafts regarding extension matters accounted for

$8,057.50 of other attorney and paralegal time. In reaching this number, the Court has added entries that are obviously related to extension matters. The total reported for this month is $66,258.50; of this amount, $17,540.50 related to extension work (taking into account KMS's reduced rate -- 21.8 hours times $435.00 = $9,483.00) and $47,519.00 related to monitoring work. These amounts reduced by the percentages above, 66% and 25%, respectively, generate a fee for February, 2009 of $5,788.37 and $35,639.25, respectively. The total amount for February, 2009 is **$41,427.62**.

### 3. March, 2009

KMS appeared to work exclusively on extension matters for a total of 27.20 hours at a rate of $490.00 for a total of $13,328.00. Extension work completed by other attorneys and paralegals accounted for $23,214.50 in fees. In reaching this number, the Court has added entries that are obviously related to extension matters. The total reported for this month is $84,884.00; of this amount, $35,046.50 related to extension work (taking into account KMS's reduced rate – 27.2 hours times $435.00 = $11,832.00) and $48,341.50 related to monitoring work. These amounts reduced by the percentages above, 66% and 25%, respectively, generate a fee for March, 2009 of $11,565.35 and $36,256.13, respectively. The total amount for March, 2009 is **$47,821.48**.

### 4. April, 2009

With the approach of the end of the school year, and a review of the remainder of the timesheets, the Court believes that a majority of the work

completed by the attorneys relate to extension work. KMS appeared to work exclusively on extension matters for a total of 59.60 hours at a rate of $490.00 for a total of $29,204.00. Of the remaining attorney and paralegal time, the Court has now excluded time obviously related to the climate study, quarterly report, and mediation (as monitoring work) (totaling $21,579.50) and is assuming that all other work is extension related. Of the total reported for this month is $145,427.50, $123,848.00 is extension related. After reducing this amount to account for KMS's reduced rate – 59.60 hours times $435.00 = $25,926.00 – work on extension accounted for $120,570.00. $21,579.50 (monitoring work) and $120,570.00 (extension work) reduced by the percentages above, 25% and 66%, respectively, generate a fee for April, 2009 of $16,184.63 and $39,788.10, respectively. The total amount for April, 2009 is **$55,972.73**.

### 5. *May, 2009*

In this month, practically all of the work completed related to extension matters. There are various entries, however, regarding the fee petition. In Defendant's brief, it argues that the "fees on fees" should be reduced to reflect 5% of the total recovery Plaintiffs may acquire for attorney fees and costs. The Court believes that the percentage reduction on all fees outlined above would account for any excess with respect to attorney/paralegal time spent on seeking fees during this month. Therefore, these amounts have not been parsed out in the Court's calculations.

The total amount requested for this month is $120,255.50. A reduction in KMS' hourly rate would require the subtraction of $3,063.50 from this amount. The revised total is $117,192.00. A 66% reduction of this amount reveals recoverable fees in the amount of **$38,673.36.**

### 6. *June, 2009*[5]

The same procedure as was used above for the May, 2009 figure is used for this month. The result is a request for $190,879.70 in fees, reduced to $187,442.20 (to account for KMS' reduced rate), and reduced by 66%, for a total of **$61,855.93** in recoverable fees.

### 7. *July, 2009*

The same procedure as used above for the May and June, 2009 figures is used for this month. The result is a request for $294,890.50 in fees, reduced to $280,861.00 (to account for KMS' and SW's reduced rates), and reduced by 66%, for a total of **$92,684.13** in recoverable fees.

### 8. *August, 2009*

In this month, Plaintiffs' attorneys worked in earnest on the fee petition (the extension matters having been settled at this point) and on class notice and settlement matters. During this month, it appears that multiple attorneys, including KMS, AR, CRA, WT, and RV, worked on the fee petition. While the Court understands the necessity of multiple attorneys working on Consent Decree matters, the justifications do not extend to a relatively simpler motion for attorney fees. The Court finds it unreasonable and inefficient to have multiple attorneys

---

[5] Document 338-2 places entries from May, 2009 with the entries for June, 2009.

work on the fee motion and attachments. In addition, then, to reducing the amount for this month by 66%, the Court will cut an additional 50% of the fees requested (the Court specifically finds that it would only take, at most, two attorneys to gather, organize, research, draft, and file a fee petition).

The total requested for this month is $97,800.00. Reducing the hourly rates of KMS and SW requires the subtraction of $3,517.50 for a revised total of $94,282.50. With the percentage reduction, the total amount due for this month is **$15,556.61.**

### 9. September, 2009

The same procedure employed for August, 2009 will be used for this month. Plaintiffs request $47,990 in fees; this amount is reduced to $46,499.50 to account for KMS' reduced rate; and reduced again by 66% and 50%. The total amount due for this month, then, is **$7,672.42.**

### 10. October, 2009

In this month, Plaintiffs' attorneys appear to have worked exclusively on extension matters. They request $7,895.00 in fees. This amount is reduced to $7,097.00 to account for KMS' and SW's reduced rates. A 66% reduction of this amount results in **$2,342.01** in fees owed.

### 11. Costs

The Court finally would allow costs associated with work completed in 2009 but would reduce the amount by 66% because a majority of the amount is related to

extension work. Plaintiffs seek $41,651.89 in costs; the amount recoverable is **$13,745.12**.

### 12. *Ms. Hervey's Fees for 2009*

It is difficult to determine what amount of Ms. Hervey's time was spent on monitoring work or extension work. Her timesheets reveal that a majority of work completed involved reviewing material and participating in telephone conferences related to special education matters. Special education was one of the areas in which Plaintiffs sought extension or modification of the Consent Decree. While review of various documents certainly may have been in furtherance of monitoring work, it seems more likely that a majority of the review and conferences were related to extension work. Therefore, while the Court is loath to broadly reduce Ms. Hervey's fee request, an across the board reduction of 66% is appropriate for work conducted in 2009.

Ms. Hervey seeks a total of $107,862.75 in fees and costs. This amount reduced by 66% is **$35,594.71** in total fees and costs owed for January to July, 2009 (there is not request for fees and costs for the remainder of 2009).

## CONCLUSION

Based on the foregoing calculations and the bolded amounts due, Plaintiffs' attorneys are entitled to a total of **$701,159.03** in fees and costs (divided into $584,846.97 for the firm and $116,312.06 for Ms. Hervey).

Entered this <u>1st</u> day of June, 2011

_____ s/ Joe B. McDade _____
JOE BILLY MCDADE
United States Senior District Judge
